Good morning. Good morning. May it please the Court, Elisa Klein for the United States. With leave of the Court, may I reserve five minutes for rebuttal? Sure. Would you mind pulling the microphone a little closer to you? Thank you. Thanks. Is that better? Perfect. As the Court knows, this is an appeal from a nationwide injunction that concerns the administration of the Medicare program and, in particular, the procedures that are used when Medicare is required to be reimbursed because another insurance company or self-insured tortfeasor is responsible to pay for the same medical care. There are two parts to the injunction, and I'll begin with the part that was entered on behalf of a nationwide class of Medicare beneficiaries. I'd like first just to very briefly step back and explain in kind of common-sense terms what happens when the Medicare program makes the first determination that a beneficiary is required to reimburse the program, and I'll direct the Court to the relevant parts of the record. The beneficiary, and if the beneficiary is represented, the beneficiary's lawyer, will receive a letter, and if the Court turns in our excerpts of record to page, it's 98 through 102, but particularly page 101. So what happens, these are the form letters that were in effect more than a year before the injunction was issued. So for these purposes, the current form letters. The beneficiary and her attorney are told, you know, this is the amount that you owe. You have a right to appeal the amount. You have a right to seek a waiver. You must pay within 60 days, and if you do not, interest will accrue. And the rate is put into the letter. It depends on a general treasury rate, so the precise number will vary. And also explicitly in this letter, although there's a description of if you don't respond at all and you don't pay, there can be a referral to treasury to collect the amount you owe through offset against other benefits. The letter explicitly says, please be advised that Medicare does not refer debts to treasury for collection if they are the subject of an administrative appeal or judicial review, and also says, before Medicare refers your debt to treasury, you will be provided with notice of the intended referral, including information concerning appropriate steps to take to avoid the referral. And as we've discussed in our brief, it's longstanding HHS policy as a matter of discretion that if a beneficiary chooses to dispute the amount that's owed or dispute it in its entirety, there will be no referral to the Department of Treasury for collection. That's a matter of your good nature? Or, I mean, suppose the Secretary has a change of heart? The Secretary could revise the manual. That would be a real thing. The manual provides the direction to the contractor. It's a single contractor now who administers the whole Medicare secondary payer recovery program. We put in the record, it's, I believe, excerpts of Record 106. That's the excerpt from the 2008 manual, which predates this litigation. But that's not a new policy. And there's a declaration in the record that talks about how, you know, this has been the agency's practice. I have no reason to think that the Secretary will change her policy or a future Secretary. However, if the court were not to vacate the injunction on jurisdictional grounds, we've also explained why this policy is properly discretionary. It's not mandated under the Federal Debt Collection Statute or the implementing regulations. But just so getting back, just to the very nuts and bolts. So the beneficiaries are explicitly told, don't worry, there won't be a referral. That reflects longstanding agency policy. And it also reflects the experience of the single named plaintiff, McNutt, who incorrectly received a notice that said your debt will be referred for collection to Treasury. And that same notice did say you have a right to contest the, you know, the debt. But that he should not have gotten that notice. His attorney called it to the contractor's attention, and I think two months after it was called to the contractor's attention, he got a letter back from the agency saying, our mistake, you know, it's against agency policy. We do not make these referrals because, you know, while you have an administrative appeal pending and there will be no such referral. And even though this is, like, framed as a class action and the claim is that the members are too numerous to join, there is no example ever of a debt actually be a disputed debt while there's an appeal pending being referred for collection. That would be contrary to agency policy. So if you look at the court, looks at the injunction, which is at Excerpts of Record 28, we have a nationwide injunction that enjoins the Secretary of the Treasury from demanding payment of an MSP reimbursement claim with threats of commencing collection actions before there is a resolution of an appeal or waiver request. That's not a proper injunction. There's no, either under ordinary equitable standing principles, you need to show an imminent risk of harm in order to justify injunctive relief. No one can make that showing, neither the named plaintiffs nor anyone in the class, because that would be contrary to our policy. And there's also, if the court were to get to the merits, and this is a hypothetical question and we're not asking the court to address it, the Secretary could, if she chose, change her policy, because under the general debt collection regulations that are cited in our brief, the circumstances under which you can't make a referral for collection while there's a pending administrative appeal or waiver request are, one, if the organic statute forbids such a referral. So the district court here recognized the MSP statute doesn't forbid any such referral. Or, two, if the agency, if it took in the money, would be prevented from returning it at the end of the administrative process if the beneficiary were to prevail. And that's not the case here, either. This is where the district court was mistaken. The district court believed that if HHS collected, not principle, but interest, that HHS would be precluded from refunding that interest if the beneficiary prevailed. And as the experience of Plain and Harrow illustrates, that's just not true. Of course, if someone overpays, including an overpayment of interest, that can be returned. I think the district court was just, mistakenly read a footnote in one of our briefs which just talked about the general principle that the United States doesn't pay interest on overpayments and confused that with the question whether we could return interest that had been incorrectly paid. So if the Court were to reach the merits, then the injunction should be reversed on the merits as well. I'll turn to the attorney injunction, unless I just want to make sure I've answered questions. Oh, I just forgot to mention, under, even apart from the ordinary standing principles which are sufficient to vacate the injunction here, this Court's decision in Hodger's Durgan, which we cited at every stage of the litigation, including the summary judgment papers and opposing class certification, we said, no, you have to have an imminent threat of injury. The named plaintiffs don't have standing. The class members don't have an imminent injury. Like, there's no basis for an injunction. But there's also, of course, the special review provision of the Medicare Act, which is an independent reason that you shouldn't have an injunction of this sort. Ordinarily, I can't promise that the contractor will never make a mistake again the way the contractor did with McNutt, but if that happens, the obligation that Congress has established is you need to raise that mistake with the agency first and give the agency a chance to correct it. And that, of course, also prevents the courts from being inundated with disputes that the agency might be able to resolve and take off the table. Can I stop you there? Because the district court's order at page 7 talks about the failure to exhaust, and I think the district court understood that there was just an allegation that McNutt had failed to exhaust. But I don't see anywhere where the district court addressed failure to present the claim to the Secretary. And I'm not sure the government argued that before the district court. So that's my first question. Did you argue failure to present as opposed to failure to exhaust? I don't remember what the terminology was. But what we argued was if you have – if there's a mistake in a letter you get, you have to raise that with the agency. And we said very clearly, McNutt, you know, he raised this argument, but he got relief. So it's not so much that he didn't present it. He did present it. But then he got relief. And there's no case in the history of this 405G, 405H that says if you get relief, you can then go to court. All of the normal cases are you present your argument and the agency says, I disagree, and then you can go to court, and there's a question of how many layers of administrative review you need to go through. But the others – I mean, Harrow had everything resolved before the amended complaint was even filed, much less the second amended complaint. And she never raised any issue of referrals to Treasury. She just said, I don't owe this amount. I owe less. And now – Well, she did. She did in a follow-up letter. Her initial letter challenged really what I'll call the calculation of the reimbursement amount, right? And then there was a follow-up letter that challenged the Secretary's authority to withhold the funds pending her appeal. That was a different issue. That wasn't about referrals. That was the attorney – the question about whether the attorney should be permitted to disperse to her the settlement proceeds before she had finished her appeal process. But on discovery, what came out was that the attorney actually had dispersed everything. I'm not forgetting whether it was before the second amended complaint or before the amended complaint, but certainly before the second amended complaint. Not before the complaint was filed. The original complaint was filed. Well, the operative complaint would be the second amended complaint. But again, this – I'm happy to turn to the attorney part of the injunction. But this was not about – she never received a referral of her debt to Treasury for collection. This was just – you're correct, I believe, that she was arguing that she should be able to get her funds from her attorney. But – and she did, in fact, get them. And so by the time Ms. Court in – who was Bates? 511F3rd at 987 said that if you're talking about class certification and a class action injunction, you look at the time of the certification to determine whether the plaintiffs have standing and whether the class would have standing. And that – the class wasn't certified here until final judgment. I'm just responding to your statement that she never raised this argument. And I think I read the correspondence differently, but I don't want to use up all your time, so. Actually, very briefly before moving to the attorney injunction, I just want to address the issue of interest, because I think the parties are talking past each other somewhat. The district court – the injunction does not include the word interest. The district court did not enjoin the Secretary from charging interest, from having interest accrue. And I just want to make clear that the district court expressly recognized that interest accrues. If – now, of course, if someone ultimately wins in their administrative appeal, they don't owe any principal, they don't owe any interest, the only time you actually owe the interest is if you don't pay and then lose in the administrative appeals. It's only on that part. If we buy your argument that there is no imminent collection proceeding because of the policy that the Secretary has or whatever, what's the legal pigeonhole for that? Is that standing? Is that not right? Is that they just don't meet the injunction standards? How would you – what would be the legal term for that? I believe it's a principle of standing, but it's particular to when you're seeking prospective equitable relief. And the case that's right on point is Hodger's-Durgan, which is this Court's en banc decision. We cited it in our brief and we cited it in district court, that says to justify an injunction, you have to show imminent threat of injury. And here, since there is no referral, there is no threat of referral, there can't be an imminent threat of injury. So it's standing. This Court – I'm being kind of careful because this Court has said standing and – Kind of a funny use of the term standing, I guess, is what I – yeah. Well, the Supreme Court has talked about standing to seek injunctive relief. Yeah. Requires a showing of that the injunction will protect you from imminent harm. And this Court has, I think, probably correctly said it blurs into the general equitable concept of you don't get an injunction except to prevent imminent irreparable harm. And that's – we quoted those portions of Hodger's-Durgan to the district court, but the district court did not address it. They derailed you from your – you were getting ready to talk about the lawyer. Yes. But I just want to – just to close the loop on interest, I just want to direct the Court to excerpts of Record 18, which we cite in our brief, but this is where the district court correctly said the Medicare secondary payer provision that interest will accrue from notice of the settlement – that's the tort settlement or the insurance settlement – is strong incentive for beneficiaries to pay what they owe Medicare prior to expiration of the 60-day period, leaving only the disputed portion of the claim unpaid because the MSP statute expressly provides for interest to be calculated from the notice of settlement. The Court finds that the Secretary's calculation of interest is both authorized and rational. And I'm just going over this because I want to make clear that we did not appeal an interest injunction because there is no interest and no anti-interest injunction. With respect to the attorney, and this was the plaintiff's disclaimed request to certify a class of attorneys, and the attorney could not represent a class of beneficiaries. So the question there is, once the personal injury lawyer receives payment from the primary plan, you know, typically the liability insurer, his argument is if he gives that money to his client, the beneficiary, reimbursing Medicare becomes exclusively her problem. Obviously, she has to do it, but that he can kind of wash his hands of the matter and can't be required to reimburse Medicare, even if it's determined that Medicare should have been reimbursed and the beneficiary didn't do it. This comes up quite rarely, but it's – you know, it is – it does come up. And there's a longstanding regulation that defines the term entity that has received payment to include an attorney. In 2003, early 2003, the Eleventh Circuit in a decision called Baxter said – it was dealing with an escrow agent, but it was a similar argument – said, no, like, the only entities that have to reimburse Medicare are the endpoint recipients, so the ones who ultimately get to keep the money, which would mean the provider or the beneficiary, the physician, someone like that. And rejected the Secretary's position in that case with respect to that issue. There were lots of other issues on which the Secretary prevailed. Congress subsequently, in response to Baxter, but a number of other cases, too, on which there had been circuit splits regarding MSP recovery, eliminated the language from the statute on which the Baxter Court had relied. The Baxter Court had said, correctly, the statute says the Secretary can recover from any entity that has received payment, including a physician or provider. And the Baxter Court said, using that Latin phrase that I'm not going to try to pronounce, you know, like, only from people like physicians and providers, endpoint recipients. And Congress eliminated that language and thereby ratified the agency's longstanding regulation that's like, no, recovery is not limited to endpoint recipients. Do you have a lien? Do you claim a lien on what the law holds? We have both a subrogation right, which means we stand in the shoes of the beneficiary and are entitled. So we have a claim on the proceeds that the attorney is holding. But as this Court explained in Zinman, we also have a separate direct right of recovery against an entity that has received payment. That gives you the right to sue. Where do you also claim a lien? Well, the subrogation rights, that is, that does give us a lien on the proceeds. Well, lien and subrogation are different things. Well, we have a right. If it's a lien, I don't see how they can disperse it to the beneficiary. Didn't the district court make a finding that there is not a lien? Well, the district court analyzed Arizona law, but I don't believe, I don't know if the court was purporting to analyze Federal law. But our lead argument is that it doesn't matter whether we have a lien, and certainly Arizona law doesn't matter, because Congress clarified that it's not just the endpoint or the recipient. When Congress says we can recover, you know, any entity that has received payment really means. If that's all you have, then they can disperse it to the client, they can go to Las Vegas with it, they can do whatever they want with it. You can go and try to get it back, but you don't have a lien. I see. I understand. I misunderstood the question. Yes, Your Honor is correct. They can disperse it. It just means that ultimately if we're not paid, we could sue them and say we never got paid this amount. But that's, I'm not disagreeing. It's not that they can't disperse it in some, like, you know, sense other than that. If they disperse it, they remain at rest. Just to be clear and to get an answer to Judge Silverman's question, because I really want to answer this question, is it your position that you have a lien or no? My understanding is that our subrogation rights do give us a lien, but we didn't brief that, so I don't want, I should not stand here and say, yes, we have a lien. I mean, I know that, like, our contention in general is that it doesn't matter whether we have a lien because we have a direct recovery right. Well, let's assume you don't have a lien. What business do you have sending them a letter telling them they can't disperse the money? Well, we say, the current letter says funds should not be dispersed, you know, without repaying Medicare. But all that just means is there will be a consequence if you do it, then understand you're still on the hook if ultimately it's determined that Medicare wasn't reimbursed the amount it should be. If your letter said, hey, you want to disperse the money, you do so at your risk, we're going to come after you, that's one thing. But if you tell them, in effect, we're asserting a lien, you can't disperse it, which is what it sounds like the judge enjoined you from doing. Well, again, I don't believe that the plaintiffs are saying all we want to be told is we can disperse it, but we remain at risk. Our understanding of their argument is Mr. Ballantine does not want to be at risk. He's saying I want to be able to disperse it. Okay, but the injunction said lawyers are prohibited from withholding proceeds pending the calculation of the reimbursement amount. From demand. Again, I mean, we're talking about attorneys who are familiar with the regulation. I'm just trying to understand. What exactly did the judge say? Do you have it in front of you? I have it in front of me. Can you read it for me? Oh, sure. I'd be happy to read it. The defendant is enjoined from demanding that attorneys withhold liability proceeds from their clients. I'm not sure you have any right to demand that they withhold it from what you just told me. The problem is I'm reading the opinion, and the opinion along with it says only an endpoint recipient can be required to reimburse Medicare. And I'm concerned that what the judge meant was the tort lawyer is off the hook. And if that's what's meant by the injunction, that would be very problematic and not true. Under the regulation, the tort lawyer is not off the hook. He can put the money in escrow. He can give it to his client. However, if it turns out that Medicare is not reimbursed, he is potentially liable to Medicare. I just didn't read the injunction as saying you're, you know, you're olly olly oxen free. You don't have to ever pay it. It's just that you're not the judge enjoined HSS from threatening, you know, from claiming a lien when you don't have a lien. Well, I'm happy to clarify standing here that the attorney – if the attorney pays it to the Medicare beneficiary, the only consequence is that the attorney is potentially liable to Medicare. That's it. I see you. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Gilbert Ford. I represent the plaintiffs' appellees. I'd like to step back a little and put this case in context, because I think the government has misstated in some ways, both in its briefs and this morning, what the issue of the case is. This case is about coercing and threatening Medicare beneficiaries and their attorneys into turning over payments that were conditional settlement payments before the correct amount of that payment, which is usually much less than what they're told it is, has been established through the administrative process. And let's look at Medicare beneficiaries, because they're crucial in this. We're talking about an extremely vulnerable group of people. By definition, they're elderly and disabled. All of them in this case have recently suffered some sort of serious injury. They are, contrary to popular opinion, relatively poor. The median income of Medicare beneficiaries in this country is $22,000 a year. They need money, and it's not easy for them to give it up. And yet they are being threatened, seriously threatened, by Medicare's agent, private agent, to disperse amounts of money that are much more than they should be required to give up. And these are serious threats. And that's the nature of this case. It's the threats and coercion which is at the issue here, not whether or not the case is referred to Treasury or could be referred to Treasury. The revised collection letter to which my opponent referred, which is, I believe, it's Excerpt from Record 98. It's a five-page, single-space letter that the collection agent sends to the beneficiary and to the attorney. And it says specifically that if you don't pay the money within 60 days, the money that we say you owe, if you don't pay within 60 days, we will collect the amount that we think you're owed from the Social Security Administration, from the Railroad Retirement Board, from future Medicare benefits. It even says we will refer the matter to the Justice Department, quote, for legal action, end quote, whatever that means. Now, it's true they revised that letter, the original letter, to take out the fact that it could be referred to the Treasury Department. But these other referrals are still in there and they're still threats which are made to beneficiaries and their attorneys, and they believe it. Again, we're talking about vulnerable class people. The Third Circuit, in its fanning decision, talking about the original letter, which only was different in the fact that it said it could be referred to Treasury, the Third Circuit referred to these letters as coercive and threatening, as, quote, heavy-handed collection tactics, end quote, as, quote, more suggestive of tactics one might attribute to a less than reputable collection agency than to one's own government, end quote. And that's the nature of these case – of this case, these threatening letters. What this case is not about, however, despite what the government says, is whether Medicare has or doesn't have a policy of referring debt collection to the Treasury Department. That's a very small part of the threats that they've made in the past, a very small part. And whether they do that or not is really not the issue of this case. And whether they make that threat or not is really not the issue of this case. I also want to point out who is making the decision to – who is making the demand on these amounts. It's not the government. It's something called the Medicare Secondary Payer Recovery Contractor, the MSPRC. And it makes the decision. It's a private entity which has the sole contract around the country to make these decisions and send out these demand letters and try to recover this money. Of course, it is – it is sort of controlled in some respect by the Secretary, but it's the one that's making the decision on a day-to-day basis. It's not a government agency. And what's critical and why the decisions are often wrong, usually wrong, I'd say, is that the MSPRC lacks the information when it makes the decision to distinguish between the amounts that should be repaid because of the conditional settlement that was paid to the beneficiary and other Medicare benefits that have been paid out, and the MSPRC lumps them all together quite frequently by some basis and doesn't realize that they're distinguishable, and then demands payment for the entire amount, even though they should be only demanding payment for a small amount of this. I point out to you the three named plaintiffs, what happened to them. Ms. Hara was asked to repay $1,682. That was ultimately reduced to $700. Mr. McNutt was asked to pay $26,487. That was ultimately reduced to less than $12,000. Mr. Hall was asked to pay – or I should say demanded to pay $3,658, and that was ultimately reduced to zero. The fact is they regularly make serious mistakes, but the government, through these demand letters, through the MSPRC demand letters, makes a serious effort to coerce people into paying it back within 60 days. Furthermore, the other aspect of this case is the attorneys are here being used as collection agents. They have the money. Yes, Judge Gould. Before you go on to the attorneys, as to the beneficiaries themselves, did they have an obligation under statute to present their claim to the agency before making a Federal suit? There is a presentment requirement, Your Honor, under 42 U.S.C. section 405G, which is the General Social Security Act review provision, which is incorporated. They do have that obligation, and in this case, all the beneficiaries did, and by definition, all the class members did. Presentment was raised by the government for the first time in its reply brief. It was never raised below. It's not raised in the opening brief. I don't dispute that they have a right to raise it now because it's jurisdictional. It's a jurisdictional issue. But the point is, I think it demonstrates the weakness of both their exhaustion argument and their presentment argument, that they've essentially dropped the exhaustion argument after arguing it below and in their opening brief and replaced it with a presentment argument. All these beneficiaries Does the record show that there was presentment by the named plaintiffs? Yes, it does, Your Honor, because each named plaintiff received what is called an initial determination, and that is referred to repeatedly both in the record and in the government's briefs. The initial determination is the demand letter from the MSPRC saying you owe the government X thousands of dollars. Based on that, the individual then has the right to challenge it either by seeking waiver and or by appealing it. But that is by sending the government the information about the settlement, that they've received the settlement, that triggers the initial determination. And the initial determination is what begins the process. But, Counsel, that's very different. That's contesting the calculation, the amount of the reimbursement due. And this goes to my question for opposing counsel. The initial letter written on behalf of Ms. Harrow contested the amount due, if you will, from $1,600 to about $1,800. That's the distinction that you were referring to a minute ago. Then there's a February 2nd letter at Excerpt 35 that separately raises this argument that the Secretary may have exceeded the scope of her authority by demanding the payment up front, if you will. But what troubles me is that March 3rd and March 4th correspondence, where the Secretary then comes back and says, okay, we've looked at your earlier correspondence, we'll drop the amount to 6 the reimbursement amount to 696. That's at Excerpt 39, as I'm sure you know. And then the subsequent correspondence, which seems to have maybe crossed in the mail, trying to get that number nailed down. That's correct. But anyway, it gets nailed down, and the funds were tendered. And that takes me to Excerpt 48, which I think is Judge Gould's point, or I hope it is, where the correspondent says, we've received your $800 check. The amount that you owe has been reduced to zero. Our file is being closed. And never. So now they've worked out the amount due, but I don't see this other argument that the Secretary exceeded the scope of his authority being raised, or nobody raised their hand on behalf of Mrs. Harrell to say, hey, wait a minute, we have another argument here. Your Honor, the presentment issue is very liberally construed by the courts. The whole idea is simply to get the ball rolling in the administrative process. Beneficiaries are not required to raise every conceivable issue when they present their claim. But this is really different to raise a difference of opinion about the amount of the reimbursement, which you've just articulated happens a lot, right, happens all the time, and this other argument about, hey, wait a minute, you don't have a right to demand the money up front before I exhaust my due process. The Supreme Court and this Court have said that that distinction is meaningless. Let me give you a couple of sites. Please. All right. Matthews v. Eldridge, which is sort of the granddaddy of all cases involving presentment, 424 U.S. 319, 329. Pretty familiar with it. The court said there that presentment was satisfied by the individual filling out a questionnaire stating that he was still eligible. That satisfied presentment. That was not the issue raised in court. The issue raised in court was pre-termination hearings. He never raised that. The Supreme Court said explicitly it wasn't necessary for him to raise that to satisfy the presentment requirement. Is it your position, because you've taken the position that each one of these folks presented the claim, is it your position that, well, let me say first of all, the only place I see it presented in the sense of being raised separately from a reimbursement request determination is the Harrell letter that I just mentioned to you on February 2nd? As to the other two, are you telling me there's a place in the record where they raised this separate argument about the scope of the Secretary's authority? They do not have to raise it to satisfy presentment. So is the answer to my question no? I just want to be clear we're communicating. I don't know, because I've never looked at that issue, because I'm certain that presentment does not require that specificity at the first level of administrative review. It merely requires challenging what the Secretary is doing, and from that, a beneficiary has the right to go in any direction that he wants to. Let me give you another example. Okay, but they have to articulate and give the Secretary an opportunity, right, somewhere? The Secretary has an opportunity, has the administrative process, and then different issues develop during the administrative process. Sure. And that's exactly what happened in Matthews v. Eldridge. Okay. Okay. So in this case, can you help me see any place else in the record, in the administrative record, before anybody went to court, where this issue was articulated, where it was developed, to use your words, so that the Secretary had an opportunity to respond? I do not know offhand, Your Honor, if that – if there are any letters in there from the attorneys raising that issue. But I will stand on the law on this, that Matthews v. Eldridge stands for the proposition all you have to do is present your claim, and then when you go to court, you can get into procedural issues and anything else you want to get into. Matthews v. Eldridge was a constitutional case. Surely the beneficiary didn't raise a constitutional challenge at the first level of administrative review, and the Supreme Court said they couldn't possibly expect it to. The Secretary's not going to change his policy. You're talking about the difference between an individual disability issue, or individual benefit amount issue, and a policy of the Secretary.  And over and over again, you're citing me to Matthews v. Eldridge, and — I can give you other sites if that would be helpful. I mean, we haven't had a chance to respond to this, because, as I say, the government only raised this issue for the first time in its reply brief in this Court. Never raised below, not raised — apparently, they've dropped the exhaustion argument, which they raised in their opening brief. They don't raise it in this brief. I don't want to take up all of your time, but you are touching on one question I had for opposing counsel, and that is whether this was raised below. I think you just told me it wasn't. The district court mentioned in his order at page 7 that his impression was that there was just a failure-to-exhaust argument as to McNutt only. Is that accurate? That was the only argument they raised in the district court with respect to exhaustion, having to do with Mr. McNutt. They never raised it with Ms. Harrell. They never raised it with Mr. Hall. And so exhaustion was only raised in the district court with respect to Mr. McNutt, and it was only raised in this Court in the opening brief. And now it's been dropped. There's a footnote in the reply brief in which they effectively admit we're now moving on to resentment. They don't say we're dropping exhaustion, but that's a necessary implication of that. I just want to make sure I'm not losing the forest for the trees here. Your main point is that they have no legal right to ask for reimbursement until the appeal process is over. Is that it? Yes, Your Honor. That's correct. What exactly prohibits them from doing that? We believe that that is inherent in the Medicare statutes appeal process, which is a comprehensive statute setting out the rights of beneficiaries to challenge the amount they're being asked to pay, whichever the context. This is just sort of a general, your view of how it should be interpreted. There's nothing specific that prohibits it. There's no specific provision in the Medicare appeals process which says that it trumps the Medicare secondary payer program. But that's the only logical way to put the two together. That's what the district judge did. Another logical way to look at it perhaps would be, yeah, you have to pay him back within 60 days, but you can, if you overpay, you can get an adjustment just like your people did. That really wouldn't make any sense given the whole purpose of the appeals process in Medicare and the waiver request, which is to give people a break, especially waiver, is to give people a break if they think they're being asked to pay back too much more than they can afford. If they have to pay it back within 60 days, then there's very little purpose to the Medicare appeals process. Well, they can get the favorable ruling that your clients got. Yes, they might get it in a month or two, or in Mr. McNutt's case, he'd been waiting two and a half years to get a ruling. He initially challenged the amount that he was asked to repay, which incidentally was mostly principal, not interest. The government argues it's only interest. $430 is principal, and I think $30 is interest, and that's clearly set out in the administrative record, in the excerpts of record. He challenged that back in April 2010. He only got the ALJ decision about two months ago, and the case is still pending before the Medicare Appeals Council. So he's been waiting two and a half years to get a resolution, and I think that's not atypical. Turning to the lawyer, the injunction with the lawyers, is it your contention that the demand that they not disperse any funds to the client is improper because they don't have a lien on the proceeds? Is that it? Well, there's two answers to that. First, Your Honor, there is no lien at issue here. I think that's fairly well documented. I think that was said in the Zinman decision, either the district court or the court of appeals. I can't remember which. I don't think there's ever been any dispute that there's no lien at issue here. A lot of attorneys think there's a lien. The government wants them to think there's a lien because that puts the fear of the government into them. But there is no lien at issue here. But it's also our position that the government can't coerce attorneys into a decline to pay off, pay the money to the beneficiaries when they want to. Well, if they had a lien, they'd have to honor the lien, wouldn't they? There is no lien. Okay. That's why I think the linchpin of this is that there's no lien. If they have a lien, they have a right to assert their lien, if they had a lien. But if they don't have a lien, then they can't assert a lien. That's correct. And we also say that attorneys cannot be forced, essentially, to pay money, forced to pay money back to the government when they want to pay it to the beneficiaries because there's no regulation, real regulation for that. I'd like to cite a regulation which is relevant to this. We did cite it a brief, but I'd like to emphasize it. It's 42 CFR 411.24i1. It's what's listed as a special rule. And it says that the primary plan, namely the insurer, not talking about an attorney now, the primary plan may have to pay money back to Medicare, pay the conditional payment, even if it has already paid it to the beneficiary. It specifically says this is a special rule. There's no such rule for attorneys. And we think that suggests that once the attorney pays the money to the beneficiary, the attorney is no longer responsible for paying back to Medicare. Why would there be a regulation specifically requiring that the primary plan has to pay the money twice if the attorney does not have to pay the money if he's called on it? There's no rule requiring the attorney to pay it back under those circumstances. We think that's critical. And we think, again, the government is trying to coerce and essentially threaten attorneys to get them to pay the money to Medicare rather than to the beneficiary. I wonder if I could speak briefly to the standing issues, because that has also been raised, unless you have further questions on these points. First off, the only person whose standing was questioned in the lower court was Ms. Harrell, and the district court specifically held that she had been injured and she, therefore, had standing. But the district court also found, and this is critical, that her situation was capable of repetition, yet evading review, because she could easily have the same situation arise. Again, any time she suffered any kind of injury, it doesn't have to be in a car accident. It could be slipping in a grocery store, or perhaps she might have a drug reaction to some sort of medication. She is susceptible to getting a settlement and would go through the same process again. I think the district court was correct that even though the harm might not be ongoing, the same harm might not be ongoing, it's quite capable of repetition and evading review. Why would it evade review? I can see where it could happen again. Why would it evade review? Because the process of being forced to pay back the money so quickly happens very quickly. It wouldn't be time to go to court and exactly the situation we got. All of the plaintiffs in this case would have been able to get a TRO from a court. I can't imagine a court, no offense, but I can't imagine a court granting a TRO. I don't see how it would evade review. I mean, if this came up again, if tomorrow she goes and slips on a banana peel and then, you know, whatever happens, and she gets services, they send her another letter saying you have to pay us back in 60 days, I don't understand why you couldn't go and ask the court to enjoin them from Dunninger or whatever they're doing. I hadn't thought about that, Your Honor. I don't see that. If it could come up again, I don't quite see how I would evade review. Let me just quickly deal with two other standing issues which I think should nail it down. One is Mr. McNutt's situation. The government claims that since he's already paid the money that he owes, plus he thinks much more than he owes, therefore, there's no unpaid debts remaining and, therefore, none of the named plaintiffs have standing. Mr. McNutt's situation, as I said, is that he paid more money than he should have, and he still has, I think, $430 that's at issue that he believes he's owed, and it's not interest, it's principle. So I just want to point out that the government's argument that it's only interest is simply wrong. Finally, and most important on the standing issue, sort of covering everything, is the relation-back doctrine. And we believe that applies here. And the government completely ignored that in its reply brief. We argued it in our brief. The government ignored it. The beneficiaries had live claims pending when the class action complaint was filed so that the class claims would survive even if the individual plaintiff's claims were determined to be moot. As I've said, I don't think they are moot, but even if they were, the class claims survive under the relation-back doctrine. The claims were inherently transitory, again, because of the time frame. But even more important is a case we did not cite. I want to bring to your attention. It came down from this Court just a month or two before our brief was filed, and we didn't see it. It's a case called Pitts v. Terrible Herbst at 653 F. 3rd, 1081-1090. And that judge, by bewriting for the majority, makes clear that it doesn't have to be inherently transitory. It just has to be transitory. Mr. DeFord, thank you very much. Thank you, Your Honor. Ms. Klein, you had a little time left. Is there a problem? Okay. Briefly, on presentment, as you would guess, you have to present the actual argument. The whole point is to give the agency the chance to correct an error or revise its policy. And a recent case that supports that, we cited in our brief, is the D.C. Circuit's action alliance of senior citizens case, 483 F. 3rd, 852. Did you raise presentment in the trial court? We raised – what I can't remember is if we specifically used the word presentment. We relied on Illinois counsel and Fanning, which are presentment cases. And we said, you have to make the argument. And again, going to action alliance, which – in which class counsel made the same argument that he's making to the Court here, unanimously rejected by the D.C. Circuit, which said, don't tell me you sent an e-mail to HHS, you didn't raise, in that case, it was a 404B waiver. Ms. Klein, let's judge your answer to the question. Is your opposing counsel correct, though, in saying that the government here first raised presentment in this case in its reply brief, in which case counsel says they haven't had a chance to brief the issue? And that would seem like if that's true, that you just raised it in your reply brief, that our normal rule is we wouldn't consider that. No, Your Honor. In our opening brief, we relied on Illinois counsel and Fanning and the same statutory provisions that were at issue in those cases, and those were both presentment cases. I think our point was absolutely clear. But in your statement of – in your argument, did you say there was not presentment? Or in your statement of issues, did you identify that as an issue? We said that the challenge was barred and the certification was barred by the Medicare Act special review provision, and we relied on Illinois counsel and Fanning, which are right on point. Action Alliance, which we discussed in our reply brief, we discussed in order to respond to the argument that class counsel is making here, which is that we don't have to raise the issue. It's enough that we challenge the amount, and that brings everything with it. And that type of argument was explicitly rejected in Action Alliance, and it really defies common sense, because the point is to give the agency the chance to fix an error, which, with respect to the only policy that was enjoined in the injunction, which is the issue of threatening referrals, the agency did correct with respect to McNutt, did change the letters. The letter speaks for itself. I would encourage the Court to look at it. And so there was nothing to enjoin, both under general equitable standing principles and under the special review provision. I see you've exceeded your time. Let me see if Judge Kristen or Judge Gould have any final questions. I just have one, and it really goes to asking you to answer Judge Gould's question about presentment. Is there any place in the government's briefing where it distinguished between presentment and exhaustion? I didn't see one, so I'm not trying to hide the ball here. I don't think you ever raised presentment as distinguished from exhaustion until your reply brief in this Court. Is that right? We did not distinguish those terms until our reply brief. But what I meant when I said Illinois counsel and Fanning and cited the Medicare special review provision is that you have to give the agency a chance to address the error by identifying it. The only person who raised the issue that's addressed in the injunction was the agency. And that's how it's supposed to work, and that obviated the basis for an injunction. Thank you. Judge Gould, anything else? No, I guess not. Thank you very much, Justice Ginsburg. Well, thank you, too. The case just argued is submitted. We'll stand recess. Mr. Sherman, thank you.
judges: Silverman, Gould, Christen